### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**JOEL DOUGLAS RUMINER**                                                      **PLAINTIFF**

**v.**                                      **NO. 4:03-CV-00349 GTE**

**GENERAL MOTORS CORPORATION,**
**and GMC TRUCK, a Division of**
**GENERAL MOTORS CORPORATION**                                      **DEFENDANTS**

### SUPPLEMENTAL MEMORANDUM OPINION AND ORDER
### REGARDING SUMMARY JUDGMENT AND
### DEFENDANT'S *DAUBERT* CHALLENGE

This Order supplements the Court's prior Memorandum Opinion, entered January 17, 2006, (hereafter "Opinion #1") in which the Court ruled as a matter of law on Plaintiff's air bag claim but left open summary judgment and *Daubert* issues related to Plaintiff's remaining claim for seat belt system failure.  The record has been expanded by the Court's January 17, 2006, Letter Order, and the parties' submissions in response.  Additionally, a telephone conference was held on January 19, 2006, during which Plaintiff was provided an additional opportunity to point to evidence or to provide additional argument.  Finally, following the telephone conference, Plaintiff sought permission to file actual documentation regarding eleven similar incidents and two crash test reports, claiming it had been inadvertently omitted from the Plaintiff's prior response, which referenced such documents in support of Plaintiff's punitive damage claim. That request (Docket no. 146) is pending.  The Court will allow the supplementation of the record to include these documents.

Following a review of the entire summary judgment record and after carefully considering the applicable law, the Court reaches the following conclusions: (1) Plaintiff has failed to come

forward with sufficient evidence – either direct or circumstantial – from which the jury could

find that the vehicle's seat belt system had any design or manufacturing defect at the time it left

the manufacturer; (2) Alternatively, Dr. Bidez's speculative testimony regarding possible causes

for the alleged seat belt failure would either not be helpful to the jury or is not sufficiently

reliable, and should be excluded from evidence as part of Plaintiff's case-in-chief; and (3)

Plaintiff failed to come forward with sufficient evidence to support an award of punitive

damages.

Each of these points will be discussed separately.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when, in reviewing the evidence in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, so that the

dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.

1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in

determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for
> trial-- whether, in other words, there are genuine factual issues that properly can be
> resolved only by a finder of fact because they may reasonably be resolved in favor of
> either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary

judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to
> demonstrate, i.e., '[to] point[] out to the District Court,' that the record
> does not disclose a genuine dispute on a material fact. It is enough for the
> movant to bring up the fact that the record does not contain such an issue
> and to identify that part of the record which bears out his assertion. Once
> this is done, his burden is discharged, and, if the record in fact bears out
> the claim that no genuine dispute exists on any material fact, it is then the

> respondent's burden to set forth affirmative evidence, specific facts,
> showing that there is a genuine dispute on that issue.  If the respondent
> fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id.*

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. Rule 56(e).  The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## DISCUSSION

**(1) Plaintiff has failed to come forward with sufficient evidence, either direct or circumstantial, which would permit a jury finding in his favor on liability.**

So, just what is the evidence proffered by Plaintiff in support of his theories of liability?[1]

---

[1]  The parties do not distinguish clearly between the asserted theories of negligence, breach of warranty, and strict liability.  Plaintiff discusses and argues his case solely in terms of strict liability, *i.e.*, whether there was a product defect.  The Court will likewise focus its opinion. Without proof sufficient to prevail on his strict liability claim, the Plaintiff can not state a

Plaintiff makes no effort to prove any particular defect in the seat belt restraint system.  Instead, Plaintiff relies heavily on GM's own witness testimony to support its contention that there must have been "something wrong" with the seat belt system based on the fact that Plaintiff suffered such severe facial injuries even while buckled in his seat belt.  For example, Plaintiff points to the report of GM engineer James White which concludes that "if Mr. Ruminer had utilized the available left front safety belt system in the crash, it would have restrained him."  (Report of James White, Exh. A to Pl.'s Response, at p. 2).[2]  Plaintiff also points to the testimony of GM biomechanics expert James W. Lighthall, Ph.D.  Dr. Lighthall opines in his report that "if Mr. Ruminer had been using his seatbelt at the time of this incident he would not have sustained severe facial fractures."  (Report, Exh. B to Pl.'s Response, at p. 3).

These comments must be considered in context.  First, Mr. White's and Dr. Lighthall's testimony was given in the context of their opinions that Plaintiff was not wearing his seatbelt at the time of the accident.  This issue, of course, is a hotly disputed issue in this case.  While the Court assumes, for purposes of determining summary judgment, that Plaintiff would ultimately prevail on this issue before the jury, it must be remembered that this disputed issue of fact was at the heart of Dr. Lighthall and Mr. White's testimony.

It is equally clear that neither Dr. Lighthall nor Mr. White is saying that if Plaintiff had been wearing his belt he would not have been injured.  Rather, it is their opinion that had he been

---

submissible claim on his theories of negligence or breach of warranty related to the alleged seat belt failure.  And, indeed, the summary judgment record here reveals no independent evidence of negligence on the part of the Defendant in manufacturing or in designing the seat belt system or that would independently support a claim for breach of an implied warranty.

[2]  In the future, the Court urges the parties to submit an exhibit index and/or to describe the exhibits when electronically filing exhibits.  Doing so makes location of relevant exhibits much easier.

restrained his injuries would not have been as severe.  For example, Dr. Lighthall, GM's

biomechanics expert, opined:

> Even when worn seatbelts cannot prevent all injuries in all accidents.  This is particularly true for "unrestrained" portions of the body such as the extremities and the head.  In this case if Mr. Ruminer had been wearing his seatbelt at the time of the incident the likelihood of forceful interaction between his face/head and the upper steering wheel rim and steering wheel hub still exists.  However for a properly belted driver, the severity of the injury would be mitigated.

(Dr. Lighthall Report at p. 5).

Plaintiff also offers the testimony of Dr. Bidez, a biomechanics expert, whose

examination of the vehicle and Plaintiff's injuries led her to conclude that Plaintiff was belted at

the time of the accident.  Dr. Bidez will also testify that the seat belt system failed to properly

restrain Plaintiff.  In her opinion, the Plaintiff's "lap-shoulder belt appears to have experienced a

late lock-up, if it locked at all.  During the vehicle inspection, marks on the webbing indicate that

spoolout occurred."  Dr. Bidez concludes that this "demonstrates a clear case of retractor failure

and ultimately allowed [Plaintiff's] head and upper torso to have excessive movement toward the

steering wheel."  (Dr. Bidez report, at p. 6).

This proof establishes, at most, that accepting that Plaintiff was belted at impact,  the seat

belt system did not adequately restrain Plaintiff, and that, consequently, Plaintiff was injured

more severely than he otherwise would have been.  The difficult and unresolved issue in this case

is determining why the seat belt did not restrain Plaintiff.

Plaintiff has no direct proof of any specific manufacturing or design defect in the belt

system and cannot identify the cause of the alleged seat belt failure.  But, Plaintiff contends that,

under the applicable law, no such proof is necessary.  Instead, Plaintiff proposes to have Dr.

Bidez testify regarding possible causes for the seatbelt's alleged retractor failure and offers the

following from her deposition testimony:[3]

Q.  Doctor Bidez, is it your opinion in ths case that there was a defect in the design of the seat belt, or the seat belt system, in the subject vehicle.

A.  Let me answer it this way.  I cannot rule out that there are not both design and manufacturing defects.  The evidence within General Motors is that there is clearly a design defect, and there may or may not be a manufacturing defect.  Because to my knowledge no one has disassembled the retractor.

Q.  As you sit here today, can you state with a reasonable degree of engineering or scientific certainty that there is a manufacturing defect in the subject seat belt or seat belt system?

A.  Let me state it in the affirmative.  Within a reasonable degree of engineering probability, there is a design and/or manufacturing defect in the driver's retractor and air bag system, that is the restraint system, that was the direct cause of Joel Ruminer's injury.

Q.  Please tell us the specific manufacturing defect that you believe existed in the subject – first let's talk about the seat belt or seat belt system. . . .

A.  The seat belt retractor failed to lock appropriately, to prevent injury of head contact of Joel Ruminer to the steering wheel.

Q.  Can you be any more specific than that as to what the specific manufacturing defect was?

A.  No, not at this point.  And to go back and clarify an earlier question you asked.  If it becomes important that a specific manufacturing defect is identified, then obviously, both sides are going to have to get together to disassemble the retractor.

Q.  Well, as you sit here today, you can't point us to a specific manufacturing defect, correct?

A.  That's correct.  Nor do I need to.

Q.  Dr. Bidez, have you disassembled the subject retractor?

A.  Of course not.

Q.  Have you asked anybody to do that?

A.  No.

. . .

Q.  What I guess I am asking is this.  Have you looked at any design or specification drawings for the seat belt or the seat belt system in this case, and that you can point us to a specific defect in that design or those designs?

A.  What I have reviewed and relied upon is the design failure mode and effects analysis of General Motors, with respect to the subject retractor and belt system. . . . that provides GM engineers viewpoints of all of the different failure modes that can result in improper retractor performance. . . .

. . .

--------

[3] GM contends that this testimony is inadmissible expert testimony.  That argument is discussed separately.

Q.  What is the basis for your opinion that sensor failure occurred with a reasonable degree of engineering or scientific probability or certainty in this case?
A.  Okay.  I am not going to be able to answer any string of questions like that because I said that within a reasonable degree of engineering probability, that one or more of these occurred.  Now, I cannot do that on an isolated item-by-item basis without disassembling the retractor.

(Dr. Bidez deposition, pages 15,16-17, 20, 46).

Dr. Bidez answered similarly with regard to every potential cause of the retractor's alleged failure to lock.  That is, because the retractor had not been disassembled, examined and/or tested, the specific cause of the retractor's failure could not be determined.  Instead, Dr. Bidez relies upon FMEA (Failure Mode Affect Analysis) reports prepared by GM.

Dr. Bidez testified that she took the 85 total seat belt potential failure modes identified by GM's engineers, narrowed those to 45 failure modes, all relating to retractor failure, and then further narrowed it down to 12 potential failure modes.  Dr. Bidez excluded all failure modes which would have been visible without disassembly based on her observation that no one had identified any such clearly visible problems.  Thus, Dr. Bidez assumed:  (1) that the seat belt's failure to lock (or late lock-up) was caused by the retractor; and (2) that one of 12 possible causes was at fault.  (See Def.'s Brief, Docket # 134, at pp. 14-15, and Exhibits referenced therein).

However, a review of the FMEA reports relied upon by Dr. Bidez indicates that there are many potential causes for retractor failure that are clearly unrelated to a manufacturing or design defect.  Defendant GM – under either a direct or circumstantial proof case – may only be held legally liable for defects existing in its product at the time that the product left the manufacturer.  Plaintiff, in his proof, makes no effort to negate the other post-delivery causes for seat belt failures.

The following table summarizes the 12 possible causes for the alleged retractor failure identified by Dr. Bidez in her deposition together with the likely causes listed for each.  The

information in the table is taken from the actual FMEA reports upon which Dr. Bidez relies.[4]

| Potential Failure Mode | Potential Failure Causes |
|---|---|
| (7) Sensor Failure | Contamination<br><br>Foam Degrade |
| (10) Sensor Compensator Failure, Non-Lock | Contamination |
| (14) Frame Fractures | Frame Corrodes, Fatigues from Overloading, or from Impact from Foreign Object |
| (15) Pawl Fractures | Pawl Corrodes, Fatigue from Crack Propagation, Pawl Loading |
| (16) Ratchet and Sleeve Disengage from Frame | Corrosion<br><br>Fatigue at Ratchet and Sleeve<br><br>Ratchet and Sleeve Loading |
| (17) Fatigue of Web Pin | Pin Corrodes.<br><br>Pin Fatigues from Crack Propagation.<br><br>Overloading. |
| (18) Shaft Fatigues | Vibration.<br><br>Corrosion of Shaft |
| (20) Deformation of Actuator Support | Lever Fatigues from Vibration.<br><br>Lever Creeps. |

_____

[4] Plaintiff's brief doesn't specify which of the 12 potential retractor failure modes Dr. Bidez identified from the 85 on GM's FMEA reports. The Court was able to identify the twelve failures by comparing the FMEA report to Dr. Bidez's deposition. The record is devoid of any discussion or explanation by Dr. Bidez of the potential failures causes listed in the FMEA reports and whether they could occur post-manufacture, even after the Court placed the Plaintiff on notice of this failure in the proof in its January 17th, letter and permitted Plaintiff the opportunity to respond.

| (21) Fracture of Actuator Gear | Gear Fatigue from Vibration and Wear. Actuator Gear Creeps. |
| --- | --- |
| (23) Fastener Loosens or Fatigues | Vibration |
| (29) Retractor Will Not Lock, Causing Poor Retraction/Extraction of Webbing | Trim Interference with Retractor Locking Mechanism.  Mechanism is exposed or unprotected. |
| (30) Retractor Binds Due to Mechanism Deformation | Deformation of Mechanism due to Build Variation in Seat Structure, or Inadequate Specs for Seat Structure Finish, Flatness, Geometry |

(See Dr. Bidez depo. at pp. 47-57 & FMEA Reports at line items noted in table).

Most, if not all, of these "potential causes" appear to occur post-manufacture.  Note, for example, "vibration," "overloading," "corrosion," "impact from foreign object," "foam degrade," "contamination."  At a minimum, expert testimony would be required to explain why any of these potential causes should properly be attributed to a manufacturing or design defect existing when the product left GM.  No such expert testimony has been offered by Plaintiff.

Dr. Bidez testified that she used the following "method" to pinpoint the 12 potential failures:

> ". . I looked at the failure modes identified by the GM engineers, and I looked at those that the GM engineers said would lead to lock-up performance problems, either no lockup or late lock-up, those I highlighted.  Then I looked at symptoms to the operator.  Is it visible, openly visible, and if it was because no one has identified it – and certainly Mr. Ruminer didn't either – then that wasn't plausible, those scientific basis relying on GM's own engineers.  I have identified the specific failure modes that may have, one or more, occurred in the Suburban vehicle.

(Dr. Bidez deposition at p. 47).

The following exchange is representative of Dr. Bidez's discussion of the evidence supporting her opinion with regard to each of the 12 potential failures:

> Q.      . . . Can you tell us, please, all of the physical, factual, scientific, or any other evidence that indicates sensor compensator failure non-lock occurred in this case or may have occurred in this case?
> A.      The basis is the physical scientific medical testimony that Mr. Ruminer was restrained in this crash.  I have that documented elsewhere.  All of that is the basis for every single failure mode, that he was wearing the belt GM says it should have locked and it didn't lock.
> Q.      Any specific evidence on the seat belt or the seat belt system or photograph of the – or the diagram of the seat belt or seat belt system that you can point to, that forms the basis for sensor compensator failure non-lock having occurred in this accident?
> A.      Photographs or diagrams, is that what you said?
> Q.      Yes.
> A.      No.
> Q.      Or any evidence on the belt or belt system itself?
> A.      No, because the retractor has not been disassembled.

(Dr. Bidez deposition at p. 52-53).

The Court, presented with this initial evidence, wrote to the parties on January 17, 2006, noting that the summary judgment record on the seat belt issue was confusing and appeared incomplete.   (See Docket No. 141).  The Court asked certain questions of the parties and permitted them to submit additional legal authority or argument in support of their respective positions.

 The Court specifically inquired further regarding the FEMA evidence, writing:

> In looking at the twelve failure modes identified by Dr. Bidez it appears that many of the causes listed for such possible failure modes involve post-delivery problems such as wear and tear, fractures, misuse, etc. So the question arises: **If possible explanations for any failure of the seat belt system involved post-delivery changes in the system, then has Plaintiff instead of negating causes other than defects in design and/or manufacturing, in fact identified other possible causes for the failure of the product? And, if so, has Plaintiff failed to meet the *Petrus-Chrysler-Plymouth* and *Higgins* standard, *supra*, for excusing Plaintiff from the necessity of proving a specific defect?**

(Letter Order of January 17, 2006, Docket No. 141, at p. 4)(emphasis in original).

In response Plaintiff stated:

We believe we have met and exceeded what is required by the law.  The component of the

seat belt system which is at issue is the retractor.  The retractor is physically housed within the drivers seat of Mr. Ruminer's vehicle and therefore not exposed to elements, not exposed to human contact, and not subject to alternation without tearing the seat open.  In order to expose and modify or manipulate the retractor, a person would have had to remove the fabric of the seat in the area of the drivers outside shoulder, which includes tearing up the driver's seat.  Although we believe that even GM would readily agree to what we have just stated, Dr. Bidez, through her inspection of the driver's seat has ruled out any pre-accident access to, or modification of, the retractor.

(Plaintiff's Letter Response to Letter Order, at p. 3, Docket No. 144).

This response by the Plaintiff misses the point.  Whether or not the retractor was easily accessible "pre-accident" does nothing to negate Dr. Bidez's reliance on the 12 potential failure modes  suggested by GM engineers to be the result of post-delivery causes in most, if not all, instances.

In its January 17th letter, the Court also inquired regarding whether the retractor had been tested.  Plaintiff indicated that the retractor remains in the vehicle, which is located in a warehouse under Plaintiff's control.  Plaintiff's counsel indicated that they elected not to test the retractor, because they believed it was not necessary.  Plaintiff's counsel and Dr. Bidez acknowledge that a manufacturing defect, if one existed, could potentially be identified by opening and examining the retractor, but claimed that if the retractor failure was due to a sensitivity/setting designed into the retractor (design issues), then such could not be verified by retractor testing.  In contrast, GM points out that a partial disassembly of the subject retractor could have ruled out or identified each of the 12 potential failure modes identified by Dr. Bidez.   Thus, it is uncontroverted that testing the retractor would pinpoint or eliminate a manufacturing defect.

Also in response to the Court's letter, GM pointed out that its seat belt expert, Mr. White, examined and evaluated the seat belt assembly on September 9, 2004.  Mr. White observed that there was "[n]o physical evidence of loading of the safety belt restraint system" and from his physical evaluation of the system found:

The safety belt latch plate and buckle functioned in a normal manner when the latch plate was inserted and released from the buckle.

* * *

Operation of the safety belt retractor vehicle sensor locking mechanism and the web sensing mechanism was verified by manipulation of the webbing and seat back.

(White Report, at p. 3, Exhibit G to GM's Brief in Support of Summary Judgment, Docket No. 102). In Mr. White's opinion, "[t]he left front safety belt retractor was functioning as engineered at the time of this crash." *Id*. at 4. Thus, Mr. White concluded that "it is my opinion within a reasonable degree of engineering certainty that the subject 2001 Chevrolet Suburban left front safety belt restraint system was properly designed, tested and manufactured." *Id*.

On this record, the Court must determine whether Plaintiff has come forward with sufficient evidence to  permit a jury finding that the seat belt system's failure was the result of a defect which existed at the time the vehicle left GM's control.  The present dispute calls into question burden of proof issues in product liability cases, and the circumstances in which a Plaintiff may be relieved of his customary burden to present direct proof of a specific defect.

### Applicable Law

The Court must apply the law of the forum state in exercising its diversity jurisdiction. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).  Both parties appear to agree that under Arkansas' conflict laws, Arkansas substantive law controls here.  Therefore, this court must attempt to predict how the Arkansas Supreme Court would resolve this issue.  *United Fire & Cas. Ins. Co. v. Garvey*, 328 F.3d 411, 413 (8th Cir. 2003).

### History of strict liability law and requirement of a defect

Strict liability laws were developed to create a more liberal theory for plaintiffs in product liability cases.  In 1965, the American Law Institute created a new theory which permitted recovery absent proof of negligence and regardless of fault by enacting the Restatement (Second) of Torts §

402A.  Section 402A established strict liability for one who sells "any product in a defective

condition unreasonably dangerous to the user or consumer or to his property."  With the approval

of 402A, strict liability "swept the country," (Prosser, "The Law of Torts", § 98 at p. 567-8 (4th

Edition 1971)).  By 1978, approximately 45 states, including Arkansas, had adopted the concept.

*Berman v. Washington*, 391 A.2d 1351, 1356 (D.C. 1978).

Strict liability arrived in Arkansas in 1973, with the enaction of Act 111 in 1973, now Ark.

Code Ann. § 4-86-102 (Repl.2001).  Based on the Restatement, but broader in certain respects,[5]

Arkansas law requires proof of the following before permitting recovery under a theory of strict

liability: (1) that the plaintiff has sustained damages; (2) the defendant was engaged in the business

of manufacturing, assembling, selling, leasing, or distributing the product; (3) the product was

supplied by the defendant in a defective condition which rendered it unreasonably dangerous; (4)

the defective condition was a proximate cause of plaintiff's damages. Ark. Code Ann. § 4-86-

102(a) (Repl.2001);  *Farm Bureau Ins. Co. v. Case Corp.*, 317 Ark. 467 (1994).

While strict liability was intended to relax the plaintiff's burden, the doctrine was never

intended to create liability for a manufacturer anytime a user of its product suffers an injury.  "As is

true in negligence cases with respect to the mere fact of an accident, the mere fact of injury during

use of the product usually is insufficient proof to show existence of a defect at the time defendant

relinquished control."  *Lee v. Crookston Coca-Cola Bottling Co.*, 290 Minn. 321, 188 N.W.2d 426,

432 (1971)(cited by *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1061 (8th Cir.

2005)(applying Minnesota law).  Accordingly, proof of a defect is an essential element of a cause

of action based on product liability. *Lakeview Country Club, Inc. v. Superior Products*, 325 Ark.

---

[5]  *See Berkely Pump Co. v.  Reed-Joseph Land Co.*, 279 Ark. 384, 390 (Ark. 1983),
describing the two respects in which Arkansas law is broader than the Restatement version of
strict liability.

218, 223 (1996). Thus, while a plaintiff is relieved in a strict liability case of the necessity of

proving fault or negligence, that plaintiff must still demonstrate that a defect existed and that it was

present when the product left the hands of the manufacturer.

Ordinarily, then, a plaintiff must identify and prove a specific defect in order to prevail. In

limited instances, however, a plaintiff may be relieved of the burden of proving a specific defect,

but only where "common experience teaches the accident would not have occurred in the absence

of a defect." *Higgins v. General Motors Corp.*, 287 Ark. 390, 392 (1985). As stated by the

Arkansas Supreme Court:

> A plaintiff is no longer required to prove negligence in a strict liability claim but still must
> prove the product was defective so as to render it unreasonably dangerous, and that the
> defect was the cause of the injury. The mere possibility this has occurred is not enough,
> there must be evidence from which the jury can conclude that it is more probable than not.
>
> The difficult problems are those of proof by circumstantial evidence. Strictly speaking,
> since proof of negligence is not an issue, res ipsa loquitur has no application to strict
> liability, but the inferences which are the core of the doctrine remain, and are no less
> applicable. The plaintiff is not required to eliminate all other possibilities, and need not
> prove his case beyond a reasonable doubt. It is enough that he establishes a preponderance
> of probability. In the absence of direct proof of a specific defect, <u>it is sufficient if a plaintiff
> negates other possible causes of failure of the product, not attributable to the defendant, and
> thus creates a reasonable inference that the defendant is responsible for the defect</u>.

*Id.*, at 391-92 (emphasis added).

### **Application of the law to Plaintiff's theory of liability**

In this case, Plaintiff has produced evidence from which a jury could find that he sustained

enhanced injuries based on the seatbelt's failure to properly restrain him in an automobile accident.

Plaintiff thus contends that he may prevail on this theory that the seat belt must have had some

manufacturing or design defect by having his expert discuss possible causes for the seat belt's

failure, without the necessity of identifying or proving any specific defect.

Before a plaintiff may be relieved of his burden to prove a specific defect, Arkansas law

requires that he "must negate the other possible causes of failure of the product for which the defendant would not be responsible in order to raise a reasonable inference that the dangerous condition existed while the product was still in the control of the defendant."  *Campbell Soup Co. v. Gates*, 319 Ark. 54, 59, 889 S.W.2d 750, 753 (1994);  *Higgins, supra*.  "The mere possibility" that a defect caused the injury is not enough, the evidence must be sufficient to permit the jury to conclude that it is more probable than not that a defect caused the injury.  *Higgins*, 287 Ark. at 392

     Plaintiff here failed to produce evidence that the alleged product failure could not have been caused by something that occurred after the product left GM.  Indeed, Plaintiff, through Dr. Bidez, has forcefully brought to the Court's attention several possible post-delivery causes for the alleged retractor failure.  *See* discussion, *supr*a.  Plaintiff has done nothing to offset the FMEA evidence specifically identifying post-manufacturing causes for retractor failure.  The Court recognizes that Plaintiff is not obligated to eliminate all other possibilities, and need not prove his case beyond a reasonable doubt.  See *Higgins v. General Motors Corp*., 287 Ark. 390, 397, 699 S.W.2d 741, 743 (1985).  Still, he must demonstrate that it is more likely true than not that the seatbelt's failure was due to a manufacturing  or design defect and not the result of some post-manufacturing, post-delivery problem.  Plaintiff has clearly failed to carry this burden.  See *Mixon v. Chrysler*,  663 S.W.2d 713, 714-15 (Ark. 1984)(rejecting plaintiff's circumstantial evidence that vehicle's sudden acceleration was caused by a defect, stating, "It is true that supporting affidavits against the motion for summary judgment stated none of the affiants, or others known to have had access to the vehicle, repaired, adjusted or otherwise tampered with the steering system. These affidavits do not negate slick roads, speed, driver control, normal wear and tear or other possible causes as the proximate cause of appellants' injuries.")

     Other circumstances also weigh against permitting Plaintiff's case to go forward on the

evidence tendered.  First, the doctrine of permitting inference of a defect is intended for situations "when common experience tells us that the accident would not have occurred in the absence of a defect."  *Harrell Motors, Inc. v. Flanery*, 612 S.W.2d 727, 729 (Ark. 1981).  Common experience here would not permit a finding of a pre-delivery manufacturing or design defect because such matters are  outside the realm of a juror's common experience.

It is significant that GM has presented evidence that the seat belt system appears to be intact and functional.  According to GM expert Mr. White, he examined the vehicle and found the retractor vehicle sensor locking mechanism and the web sensing mechanism and found the retractor to be functioning as engineered.  Thus, this is not a case where the defendant acknowledges that the product failed to perform as intended or in which the circumstances of the accident alone demonstrate product failure.  The question thus arises: could there be other problems or situations – unrelated to a defect – that could cause a seatbelt even if worn not to restrain its wearer.  Could it be worn improperly?  Would twisting alter its performance?  This was a relatively low velocity collision (estimated at about 14 mph at impact).  Could the circumstances of this particular accident, independently of a defect, have delayed the lock-up?  These questions are not answered.  Rather, Dr. Bidez assumes the retractor failed and, ergo, that the product was defective.  And, she arrives at her conclusions without testing the retractor.

Significantly, Dr. Bidez had access to and could have tested, or had someone else test, the allegedly defective component of the seat belt restraint system  The Court concludes that this circumstance must also be considered in deciding whether the plaintiff may on this record go to the jury on his circumstantial evidence theory.  The history of the circumstantial proof doctrine suggests that it was created, at least in part, to provide a plaintiff with a fair opportunity to prove his case when the product or product component in question had been lost or destroyed.  *See, e.g.*

*Mixon v. Chrysler*,  663 S.W.2d 713, 714-15 (Ark. 1984)(steering mechanism at issue had been destroyed by the time plaintiff sought to inspect it).  This is not to say that a plaintiff's affirmative decision not to test an allegedly defective product will always be dispositive of the circumstantial proof issue.  But, here, where the Plaintiff has possession of the device, where Plaintiff's expert opines that disassembly and inspection would reveal whether a manufacturing defect existed, and where neither excessive cost nor any other practical consideration has been cited or argued as a justification for the failure to scientifically examine the device, the Court concludes that Plaintiff's failure to disassemble and inspect bars Plaintiff from submitting his case to the jury on a res ipsa loquitur type theory.

    If the Court were to permit Plaintiff to submit his case to the jury on this record, it would come dangerously close to permitting a finding of strict liability based solely on the fact of the injury (or enhanced injury) itself.  The Court is comfortable in predicting that the Arkansas Supreme Court would not, on this summary judgment record, permit Plaintiff's case to go to the jury.

> **(2)    Dr. Bidez's Expert Testimony Regarding "Some" Unknown Defect is Either Not Helpful or Not Reliable and Must be Excluded**

    GM additionally brings a *Daubert* challenge to the proposed testimony of Dr. Bidez. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993);  Fed. R. Evid. 702.  As an alternative to its liability holding, the Court also concludes that Dr. Bidez's proposed testimony that there was "some" unidentified  defect in the retractor is not based upon her scientific knowledge or expertise and would not be helpful to the jury.  Nor is such testimony sufficiently reliable to be admissible. Accordingly, such testimony, as tendered, should be excluded.

    **<u>Nature of the Dispute Regarding Dr. Bidez' testimony</u>**

    Initially, it should be noted that this opinion deals with only that portion of Dr. Bidez's

proposed expert testimony regarding the existence of an alleged defect in the seat belt restraint system.  Dr. Bidez has other opinions based upon her expertise in occupant kinematics which are not being challenged.[6]  For example, she opines that the nature of Mr. Ruminer's injuries are consistent with his seat belt use.  Nor is it necessary to resolve GM's *Daubert* challenge that Dr. Bidez is not qualified to render an expert opinion regarding manufacturing or design defects in the seat belt system at issue here.  Rather, the issue is limited to the nature of her proposed testimony, its helpfulness to the jury, and its reliability.

### Dr. Bidez's "Opinion" Regarding Defect

The Court expressed skepticism about the admissibility of Dr. Bidez's expert testimony in its January 17th letter, stating:

> With respect to the claims of the Plaintiff based upon his allegations that the seat belt restraint system had defects in design or manufacture, the situation is not completely clear.  The Court is tentatively of the view that Dr. Martha Bidez will not be permitted to express her opinion that there was a defect in the design and/or manufacture of the seat belt restraint system at the time it left the manufacturer, because that opinion is not based upon her expertise, but rather, is based upon the common sense conclusion that Mr. Ruminer would not have been injured as severely as he was if there had not been "some such defect."  In this connection Dr. Bidez is convinced that Mr. Ruminer was wearing his seat belt at the time of the accident and that the belt should have locked but did not.  In support of her view she cites the Defendant's experts who in this case have taken the position that if Mr. Ruminer had been wearing the seat belt at the time of the accident he would not have sustained the severe head injuries he in fact sustained.  She therefore draws the common sense conclusion that Mr. Ruminer was in fact wearing the seat belt and yet was severely injured, then there must have been some defect in the manufacture or design of the seat belt system.  I will discuss the validity of this reasoning later on.  But, for now I simply note that Dr. Bidez's opinion is not based upon her scientific training and expertise, any disassembly or examination of the seat belt system, or any testing thereof.  Rather, she draws her conclusions in the same manner as lay persons, *i.e.*, by exercising simple logic.

(Court's January 17, 2006 letter, Docket No.141).

---

[6]  Dr. Bidez's qualifications and experience are impressive.

Dr. Bidez offers no opinion based upon her scientific expertise regarding a specific manufacturing or design defect.  She testified that "there may or may not be a manufacturing defect" and admitted: "I have not attempted to nail down what specifically caused the defective performance."  (Bidez depo. at pp. 16 & 23).  Since Dr. Bidez has no opinion concerning any specific defect – either manufacturing or design – for what purpose if any, is her testimony that there were potentially twelve (12) causes for the purported retractor failure being offered?

Federal Rule of Evidence 702 governs the admission of expert testimony.  The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, or experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A district court has great latitude in determining whether expert testimony meets the reliability requisites of Rule 702.  In making that determination, the district court is free to evaluate one or all of the following factors: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (stating that "many factors will bear on the inquiry" and that the above-listed factors do not constitute "a definitive checklist or test").

Dr. Bidez cannot offer testimony about what, in particular, was wrong with the retractor. Instead, she proposes to take the stand and to speculate on possible causes for alleged retractor failure.  In support, she relies upon FMEA documents generated by GM engineers and used before-

the-fact to predict possible failure modes, their potential for occurring, and the risk priority for such failures.

It therefore does not appear that Dr. Bidez used any of her expert knowledge or training to determine the existence of or the nature of any alleged defect.  She assumes retractor failure as the cause for the alleged seatbelt failure, without adequately demonstrating why.  She concludes that "if Joel Ruminer's restraint system had properly coupled his body to the vehicle seat and/or provided air bag cushioning to attenuate impact energy, he would have sustained no serious permanent injury in this crash."  (Bidez Report, Exhibit J to Plaintiff's response).   In other words, the nature of Plaintiff's injuries demonstrate that the product did not perform as it should have.  An evidentiary gap still remains.  Assuming Plaintiff was wearing his seat belt, was the seat belt's failure the result of a defect dating back to the vehicle's manufacture or was the failure caused by some post-manufacturing defect or some other non-defect cause.

"[A]n expert's opinion is not to be accepted merely because it is articulated, but must instead have a sufficient factual basis."  *Anderson v. National R.R. Passenger Corp.*, 866 F.Supp. 937, 945 (E.D. Va. 1994), aff'd, 74 F.3d 1230 (4th Cir. 1996).  The Plaintiff claims on one hand that he has offered proof of a specific defect and on the other that no such proof is required because his case may be proven by circumstantial evidence.

First, assuming this case was in fact suitable for proof by circumstantial evidence, then the jurors could apply their common sense to reach the logical conclusion that the product was defective at the time it left GM's control.  (*See* Court's letter of January 17, 2006, quoted *supra* at p. 17).  In such circumstance Dr. Bidez's testimony, as tendered, would not be helpful because it would not tell the jury anything that lay persons could not logically deduce on their own;  she would be drawing her conclusion in the same manner as lay persons, *i.e.*, by exercising simple logic.

Accordingly, her testimony regarding possible causes for the product failure, by relying on the testimony of GM's experts and by resorting to a recitation of possible causes by utilizing FMEA reports, would be unnecessary in a circumstantial evidence case.[7]

In a direct evidence case, Dr. Bidez's testimony regarding possible causes is not sufficiently reliable to be admissible. She admitted that the never attempted "to nail down what specifically caused the defective performance." (Bidez Depo. at p. 23, ln 8-19). She elected not to test the seat belt system and she also never asked anyone else to disassemble the retractor. GM has indicated that if the retractor were disassembled then it could be determined whether any of the twelve identified "possible causes" for the retractor failure in fact existed. Plaintiff admits that testing, at a minimum, would rule out manufacturing failures. Certainly, it us not enough to put an expert on the stand and to have her speculate regarding possible causes. There must be an evidentiary foundation for the expert's opinion. That foundation is missing here.

In its present form, Dr. Bidez's proposed testimony is not sufficiently reliable to be admissible.

> **(3)**     **Plaintiff has failed to come forward with sufficient evidence to support an award of punitive damages**.

Although this issue appears academic in the light its prior rulings, the Court will nevertheless take up and deal with Plaintiff's claim of punitive damages. As the Court indicated in Opinion # 1, Plaintiff has the burden to come forward with <u>admissible</u> evidence to support its claim for punitive damages. To support such an award, Plaintiff has now attached records of eleven "similar" incidents and two crash test reports. Prior to the admission into evidence of other accidents involving alleged seat belt failures, Plaintiff must make a showing that such prior

---

[7] This is not to say that GM might not open the door to such testimony depending on how it chose to defend such a case.

accidents are "sufficiently similar in time, place or circumstances to be probative." *First Security Bank v. Union Pacific RR Co.*, 152 F.3d 877, 879 (8th Cir. 1998)(citations omitted); *See also Oates v. St. Louis Southwestern RR Co.*, 587 S.W.2d 10, 11 (Ark. 1979)("before other accidents may be offered to show a dangerous or defective condition, and thereby notice to the defendant, it must first be shown there is a substantial similarity of conditions in the proof as to make it reasonable or probably that the same causes or conditions produced the same or similar results").

Plaintiff makes no effort to demonstrate or explain how these complaints and test reports are substantially similar to the facts and circumstances of any alleged product defect in this case. Some are clearly not relevant. For example, one of the allegedly similar accidents involves a complaint concerning a customer who blacked out following a seizure and hit a tree. The customer complains that his air bag did not deploy, but doesn't remember if he was wearing his seatbelt. (See Exhibit 4 to Docket No. 146). In another complaint involving a 7 car pile-up, the complainant's primary complaint is the failure of the airbag to deploy, but he also complains that the passenger side seat belt bracket came loose. (See Exhibit 5 to Docket No. 146).

The Court recognizes that Plaintiff's task in this regard is complicated by the fact that Plaintiff does not know what, if anything, was specifically wrong with the seat belt retractor. This highlights another practical problem with proceeding on the theory than some unidentified defect caused a product failure. In any event, Plaintiff has clearly failed to carry his burden to produce admissible evidence from which a jury could find, as required by Arkansas law, that GM acted with malice or with reckless disregard of the consequences from which malice may be inferred. *See* Arkansas Model Jury Instruction 2218; *In re Aircraft Accident at Little Rock, Arkansas*, 231 F.Supp.2d 852 (E.D. Ark. 2002)(discussing Arkansas punitive damages law).

## CONCLUSION

For the reasons herein stated,

IT IS HEREBY ORDERED THAT Plaintiff Joel Ruminer's Request to Supplement the Record (Docket No. 146) be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED THAT Defendant GM's Motion for Summary Judgment (Docket No.100) be, and it is hereby, GRANTED with respect to Plaintiff's remaining claims, all of which are dependent on the theory that the seat belt system's failure to lock was due to some unspecified  manufacturing or design defect.   The Court previously granted summary judgment on Plaintiff's claims based on a defective air bag.  Accordingly, no other claims remain and Defendants are entitled to judgment as a matter of law.  Judgment will be entered separately.

IT IS FURTHER ORDERED THAT Defendant GM's Motion to Disqualify Dr. Bidez (Docket No. 117) be, and it is hereby, GRANTED solely to the limited extent stated herein.

IT IS SO ORDERED this 6th  day of February, 2006.

_/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE